in the case of Wells v. Freeman Company. Good morning, your honors. May it please the court, my name is Mary Lee Schiff and I represent the plaintiff appellant in this case, Alexis Wells. This is a case arising out of Lexi's employment with the defendant, aptly the Freeman Company. That begs the question, or rather that is the question presented on this appeal. I would agree with you, your honor. The case before this court is for a de novo review of the district court's summary judgment rulings against Lexi and in favor of Freeman on Freeman's motion for summary judgment and Lexi's partial motion for summary judgment. The district court dismissed her Title VII claims, her wage payment claim, and her intentional infliction of emotional distress claims. With this appeal, Lexi's asking that this court reverse those holdings, rule on her motion for summary judgment in her favor, and remand the case with instructions consistent therewith. Given the brief time I have before the court this morning and the number of issues that are involved in the briefings before the court, I plan to focus my intention on or my arguments on the issues of her employment relationship and employee status. Of course, if you have other issues on the, or questions on the other issues, you know, please ask. The district court dismissed Lexi's Title VII claims and applied those rulings to her wage payment claim because first, she did not prove she had a contractual employment relationship with Freeman and second, even if she did, she was Freeman's employee or independent contractor, not Freeman's employee. Although this court has consistently told courts in this circuit that such issues are governed by federal law and the place to start is with the economics realities test. What in the world does that mean? I'm sorry, what? You refer to the economic realities test as if it were a thing, right? What is it? The world is full of economic realities. Yes. Cases like this usually depend on which ones matter, right? There is no written down economic realities test. It's a fantasy. We can talk about which things matter and why, but there is no such test. I would disagree with you, Your Honor. Oh, well. This court set forth the test in night and in numerous cases since night, saying that in cases where the employer- meaning who was the employer and who was the employee, the courts are to use what this court established as the economic reality test. And what is it? Tell me what it is. Yes, the test balances five factors that apply agency principle to determine the economic realities of the working relationship because the economic realities of the working relationship is a party's agreement. Is this something in the restatement of agency by chance? Yes, I mean, when the court adopted it and in your discussions, they looked at the restatement of agency. And as this, Your Honor, probably knows, different circuits apply- they don't apply different tests. In this circuit, they have- You use the same name for a variety of different considerations, which tells me that it's not a thing. We have to be thinking about what those considerations are. If you look at the restatement of agency, they have a totally different list. It's not as if there were some written down criteria that we could use. So you need to justify your argument rather than referring to this phantom. Well, there are written standards. I mean, there's five factors that this court uses. Now, when you look at other courts, they use an economic realities test that may have seven factors. But this court uses five factors. The Supreme Court of Kansas, by the way, uses 12. Yes, but if you look at those- It just tells you it's not a thing, right? Stop referring to it as if it were a thing. Tell us what factors you think matter and how we should consider them. Okay. The first factor is Freeman's control and supervision over Lexi. And that's the most important factor that this court looks at. And it's the factor that this court gives the most weight to. And with respect to the facts in this case, perhaps because the district court had already decided that Lexi had no formal relationship with Freeman whatsoever, the court devoted only one paragraph of its decision to discussing Freeman's control and supervision over Lexi. And in doing that, the district court ruled that Lexi set her own work hours, the work that she did for Freeman was simply random tasks assigned to her by Vaughn that she seemed to do on her own and at her own discretion. The district court therefore found that this factor favored Lexi's independent contractor status. However, in reaching this, we would argue that the district court did not thoroughly consider all the undisputed facts in the record and the district court misapplied this factor because it didn't even look at the supervision component. This court has said numerous times that it is control and supervision. And in this case, the district court, although the court specifically found that the work Lexi did was assigned to her by Vaughn, the court didn't then address the issue of his supervisory status, which Lexi argued he was a supervisor under Title VII. The court also, the court's decision also is not supported by the undisputed facts in the record. For example, to support its opinion that Lexi set her own work hours, the district court cited to three lines of Lexi's deposition testimony pertaining to the time she started work on the second day of her employment with Freeman. And in response to Freeman's counsel's question, did you just get up and go into the office whenever you woke up the next day, Lexi answered after getting ready, yes. Based on this testimony alone, the district court decided that she set her own work hours. The court, however, ignored that the night before her supervisor, Vaughn, sent her an email and told her, tomorrow I'm starting early, so when you are up and going, head to the office, I have a pile for you to start getting ready for next week. So Lexi, therefore, did exactly as her supervisor instructed. The district court also ignored evidence that he sent her an email and told her, be at my office at one o'clock, that's when you're going to start work. He sent her an email and said, when you get to Orlando, let me know, we've got work to do tonight. How does that differ than the interaction one would have with an independent contractor? Well, an independent contractor, Your Honor, wouldn't be going to the office to do the work. The independent contractor, by the very nature of it, would set their own schedule, would set their own work hours, would tell Freeman, here's what I can do for you, here's when I can do it, here's how I'll do it, and here's how much I'm going to charge you for it. That's not the case with respect to an employee and or Lexi. She never told Freeman, hey, here's what I can do for you. In fact, Vaughn knew that she wasn't an independent contractor or didn't operate as a separate economic entity that provided production assistance services to companies like Freeman. I mean, that's not what she was. And those are the facts that this court has to look at. She didn't say, I'm going to do this work, and here's when I'm going to do it, and here's where I'm going to be to do it. She was told by Freeman, here's what you need to do, here's where you need to be, here's when you need to do it, and here's who you need to do it with. So your argument goes to the direction of the order and the content of the order? Yes, and it goes to who supervised that. Who was the one that directed it? Mr. Vaughn settled, correct? I'm sorry, what? Mr. Vaughn settled, correct? Yes. Was that settlement confidential? Yes. You may continue. Let's look at another example. With respect to the district court's opinion that Lexi did the work assigned to her by Vaughn on her own and at her own discretion, the record evidence does not support that. I mean, that's all that is, is an opinion. You have to look at the record evidence. I mean, it would be like, here's a hypothetical, or maybe what the district court was thinking, but you're right, I can't get into the district court's head. But Vaughn would assign her a task similar to if I'm going to assign a task to one of my secretaries, and I'll say, here, I need you to review, revise, correct, and write up this brief. Well, I'm not going to sit over that secretary for the next seven hours and watch her do that work, but that doesn't mean that she's an independent contractor. I assigned her the work, she's going to do the work, and if she has questions, she's going to come and ask me, and I'm going to help her get through that. That is exactly, exactly what Vaughn did in this situation. If Vaughn, though, was supervising, say, a temporary employee, would he be doing the same stuff as he would if it was an employee? Someone who comes from a temporary employment agency. You have a secretary who comes in. That secretary, on a temp basis, is going to accomplish the same tasks that your full-time secretaries do, correct? Yes, yes. And it's a question, would Raymond be the employer of that employee? Correct. Okay, I think that, Your Honor, yeah, gets into all the cases that the Seventh Circuit has ruled on as joint employership. Is it the agency that sent the temporary employee, or is it the law firm that the employee works for and is directing? And with respect to Vaughn, I mean, he was asked specifically, did you direct Lexi's work? And he said, yeah, based on the changes I've seen, understanding that the majority of the work he assigned to her was to look at what Freeman calls pool orders, which are these equipment lists and audiovisual lists for each room that would be used at the Vive event. And she had to go through those lists and reconcile them with what Freeman had on their budget, all right? And with respect to that work, he said, yeah, I directed it based on the changes I've seen, making sure she knew what days she was working on. There were multiple days, multiple equipment lists. She was going through them, so I was making sure that her days aligned. That would have made sense to make sure she knew what she was looking at. So there's also the district court also ignored numerous other undisputed facts that establish Freeman controlled and supervised Lexi's work. These facts are set forth in 19 bullet points and appellant's brief on pages 29 to 31. So with respect to the first factor, which is the most important factor, the district court should have found that that favored Lexi's employee status, not her independent contractor status. Turning to the second factor, Your Honors, which focuses on the type of job Lexi was hired to do and the skills she needed to do that job, including whether she acquired those skills on the job, the district court misapplied this factor. What the district court did is say, okay, she didn't need any skills to do her job. So we're going to find, I'm going to find that that favors employee status. But Freeman did not give her any training. So I'm going to find that that favors independent contractor status. That's not how this court applies that factor of this test, because on the job training is evidence of employee status. I see that my time's up, Your Honor. No, you have a minute left. Oh, I'm sorry. Okay. So the district court held the second factor was neutral, and it should have held that it favored Lexi's employee status. With respect to the third factor, the district court said that, I'm sorry, okay, which focuses on cost of operations. The district court said or found that the only cost that Freeman bore towards Lexi was a payment for two meals. That's absolutely wrong. I mean, the undisputed evidence established that Vaughn told her Freeman would reimburse her. Vaughn paid for her transportation to and from the venue site. Freeman gave her a computer. Thank you, counsel. I'm sorry. Thank you, Your Honor. May it please the court. Mr. Pohl. Thank you. May it please the court. We acknowledge that the allegations against Mr. Vaughn are disturbing, but as Judge Brennan noted, Wells has settled with Vaughn. So the critical question now is whether Freeman can be held liable for what Mr. Vaughn allegedly did. It can't be. Vaughn had known Wells her entire life. She had done side jobs for him in the past, and he had been doing a side job that involved helping her become a model, something Freeman had absolutely nothing to do with. It is in this context that Vaughn asked Wells to come to Orlando for a one-time, one-week event to be a production assistant and a makeup artist. Wells admits they never agreed on the financial terms of any working relationship. These undisputed facts do not make for an employment relationship. At most, they make for an independent contractor relationship. Wells was to work for only a week. She received little instruction and no formal training. Do you acknowledge that Freeman had at least apparent authority to hire Wells? Freeman? Yes. Yes. If you're referring to Vaughn, no. Apparent authority is the authority that a principal gives an impression to the agent, or not the agent, a potential employee that this person has the power to hire. And there is no evidence that Freeman ever gave the impression to Wells that Vaughn had the authority to hire her. Do you think apparent authority depends on direct dealings between the would-be agent and the principal rather than another agent? That's what you're saying, that there's nothing that Vaughn might have said or done, and nothing Freeman might have said or done in relation to Vaughn that could leave Vaughn with apparent authority to hire Wells. Fair enough. You would be, you know, I've already referred to the restatement of agency. Yes. What you're saying would come as a shock to the ALI. Well, certainly Vaughn could give the impression that he had the authority to hire Wells on behalf of Freeman. The problem is that there was no meeting of the minds on the essential terms, and the most essential term of all, of course, is compensation. That's a different matter, but it's not what I was asking. I was asking whether there was apparent authority to hire Wells. Yes. So we could then get to the question whether Wells actually got hired, and if so, as what? I would agree with the premise, although I think it's important to note that the record is quite clear, and this testimony comes from multiple people, that Mr. Vaughn did not have the authority to hire and fire. But let's assume that he had the apparent authority to hire Ms. Wells. As I say, the problem is that there was no meeting of the minds. Wells admits that they never discussed compensation, and she was asked in her deposition, to this day, do you have any idea what your pay rate would be? No. It's difficult to imagine that she can demonstrate a meeting of the minds or an agreement on that essential term when she denies the matter was even discussed, and she says to this day she has no idea what she was to make. So there was no contractual working relationship at all. So you don't even get to the question of, to use the Knight language, the economic realities of the situation. But let's assume that we get past the contract question and move to the factors that matter. This court said in EEOC v. North Knox School Corporation that the inquiry into whether someone is an employee or an independent contractor is a legal question for the court, and that just because some factors or facts may favor employment status does not preclude summary judgment. Now, as my colleague noted, this court has said that control is the most important factor. We don't dispute that. But given that the job commitment here was so short, that provides vital context for all of the other factors. So with your permission, I'll discuss that very briefly first, and then I'll move to control. So on the length of the job commitment, it's undisputed that Ms. Wells was to be retained for only one week, which strongly favors independent contractor status. She was still in college on winter break, looking to make a little money and potentially further her modeling career by accepting this job. Companies don't go to the trouble of hiring employees for a week. They go to third-party staffing agencies like Mertz Crew and retain people as independent contractors, which was precisely the plan here. Moreover, there was no specific expectation or guarantee of future work beyond this one-week event. This court said in North Knox School Corporation that the bare expectation of work without a corresponding commitment to provide that work from the defendant is not indicative of employment status. And moreover, any future work opportunities would have been entirely project-based, which establishes, again, an independent contractor relationship. Do you think associates at a law firm are independent contractors? No. They aren't guaranteed any work? They are employees at will? What work they do depends on what clients come to the firm? I understand, but when we're talking about project work, if there is no guarantee of future work and no corresponding commitment to provide future project work, that cannot be indicative of employment status. As to the issue of control, there has to be control both as to the result achieved and the details by which that result is achieved. Here, the control, it's undisputed, was very minimal, which, again, strongly favors independent contractor status. Ms. Wells received 20 minutes of instruction and no formal training. Otherwise, she worked independently and at her own pace. Yes, of course, she was assigned particular projects. But as this court noted in Suskovich, that's not sufficient to make someone an employee. You have to tell independent contractors what to do as well. There's no evidence Vaughn checked her work. The evidence is that he told her to double-check her own work. And Wells did, in fact, set her own hours, and those hours were irregular. The first day, she worked 1 to 5. The next day, 10.30 to 4.30, and so on. And then at the event, Wells admits Vaughn didn't give her a specific time to show up. This flexibility and irregularity of working hours is, again, indicative of an independent contractor relationship. And regardless, as this court said in Suskovich, merely setting a work schedule and requiring a person to be at a given place at a given time is not sufficient to make that person an employee. You have to do those things with respect to independent contractors as well. This relative lack of control indicates that what Vaughn was ultimately interested in was getting the work done, the result, not the details by which that result was accomplished. We then come to the tools and equipment factor, and I think it's helpful to break this up into two phases. Pre-event work, and then work at the event in Orlando. As to pre-event work, there's no evidence that Freeman provided any equipment for Wells to do her work. Vaughn's office was at Wells' church. There's no evidence Freeman paid for that space. Instead, the only evidence is that Vaughn made a monthly donation to the adoption agency that was housed in that church in exchange for the space. As to the computer she used, Vaughn testified without dispute that she used a GLAD computer. GLAD is the adoption agency. It wasn't a Freeman computer. And finally, as to the incidental supplies she used, paper and pens, she said she grabbed them from one of the offices in the church. Whether it was Vaughn's office or another office, she couldn't remember. Now, at the event, she borrowed a computer for one afternoon, the second afternoon that she was there. But critically, she was not given login credentials as an employee would normally get. Someone had to log in for her, the computer was locked to the desk, and many others had access to the same bank of computers, including independent contractors. Finally, while we're here, I think it's notable that Ms. Wells was initially asked to do makeup work. She had her own business doing makeup, which she promoted on social media, and she had her own makeup kit, her own tools. That, again, is indicative of independent contractor status. As to method and form of payment and benefits, the district court said that this factor slightly benefits Wells because she was to be paid hourly. We don't contest that. Finally, as to the kind of occupation and nature of skill required, the district court said that this factor is neutral. On the one hand, certainly her job did not require a lot of skill, and what skill it required, she had already obtained from doing other jobs, including a side job for Vaughn. On the other hand, balancing that out, and this factor is relevant, contrary to my client's statements otherwise, if you see the Knight and Worth case, the court considers both skill and training. As to training, she needed little instruction. She received no formal training, and she didn't receive the time-consuming training that new employees at Freeman typically receive. So that all balances out. I would just note, though, that, again, she was asked to do makeup work, which does require a certain level of skill. So that factor is either neutral or, I would say, slightly favors independent contractor status. All of this is consistent with the undisputed testimony from three different people that when Freeman retains production assistance, it does so as independent contractors. Wells was not onboarded as an employee. She was to be processed through Mertz Crew, a third-party agency, and she was to submit an invoice for her work at the end. Employees don't do that. Independent contractors do. I'll end, with your permission, just touching on the tort claims, IIED and negligent infliction of emotional distress. As the district court indicated in its order, Ms. Wells, and I encourage you to look at her summary judgment brief for this point, did not really engage with Freeman on these claims at all. She did not engage with the elements of these torts. And so she did, in fact, waive these claims, but on the merits. As to intentional infliction of emotional distress, the evidence is undisputed that Freeman did not intend to cause extreme emotional distress. And here you have to remember that this issue is about Freeman's conduct, not Vaughn's conduct. And Wells admits in her deposition there was no reason to believe that anyone at Freeman intended to cause her emotional distress. Secondly, Freeman did not commit extreme and outrageous behavior. Freeman's behavior was not, and this is the standard, utterly intolerable in a civilized community, and Wells didn't argue otherwise. This is, in fact, a matter for the court to determine in the first instance. That's what the restatement of torts, section 46, common H says, and that's ultimately what the Indiana Court of Appeals concluded in the Westminster Presbyterian case. It decided whether conduct was extreme and outrageous as a matter of law. Mr. Paul, in your opinion, is Indiana law stricter or the same as that restatement second, section 46 requirement? I think it's generally the same and relies heavily, and it has from the beginning, on that restatement section. Now, Wells cites three allegedly false representations for her intentional infliction claim that Freeman made at the EEOC in its response to her charge. And I do want to address those allegations directly. And her argument seems to be that Freeman was attempting to cover up somehow the fact that Wells was at the event and that she was somehow Freeman's employee. And maybe the most important allegation she makes is that Freeman created a fake expense report and by doing so was trying, again, to conceal Wells' presence at the event. Here's the problem with that. While it was not Vaughn's expense report, it was a report of Vaughn's expenses, and no one disputes that. Secondly, Wells was listed as a business guest on that report because she was not an employee. And in fact, if you look at that report, that is how Freeman lists independent contractors. You'll see Lori Brennan's name on that report, and you'll see Lloyd Ellis's name on that report. Ms. Wells acknowledges that they were independent contractors. They are listed as business guests. And finally, that report notes that Ms. Wells' title was a production assistant slash makeup artist. If Freeman was trying to cover up Wells' presence at the event, it's a very odd way to do it, by listing the work that she was exactly supposed to do. I see that I'm running out of time. In short, I would simply ask the Court to affirm on all grounds. Thank you. Thank you, counsel. The case is taken under advisement.